IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VERONICA MALDONADO, | ) | CASE NO. 4:20cv01632 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Veronica Maldonado ("Plaintiff" or "Ms. Maldonado") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should provide a full and accurate explanation of the weight assigned to the January 25, 2019 opinion of Clinical Nurse Specialist Brenda Ritz, MSN, PMHCNS-BC (Tr. 486), and ensure that any evidence cited to or relied upon in making that finding is included in the evidentiary record.

## I.  Procedural History

On February 10, 2017, Ms. Maldonado filed an application for DIB and SSI (Tr. 240). She alleged a disability onset date of May 23, 2013.  (Tr. 236-246.)  She alleged disability due to major depression, bipolar, asthma, panic attacks, and non social behavior.  (Tr. 280.)  Ms. Maldonado's application was denied at the initial level and upon reconsideration, and she requested a hearing.  (Tr. 157-164.)  On March 12, 2019, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 67-90.)

On April 2, 2019, the ALJ issued a decision finding that Ms. Maldonado had not been under a disability within the meaning of the Social Security Act from May 23, 2013 through the date of the decision.  (Tr. 13-33.)  On June 5, 2020, the Appeals Council denied Ms. Maldonado's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-5.)

On July 23, 2020, Ms. Maldonado filed a Complaint challenging the Commissioner's final decision.  (ECF Doc. 1.)  The parties have completed briefing in the case.  (ECF Docs. 20, 21.)

## II. Evidence

### A.      Personal, educational, and vocational evidence

Ms. Maldonado was born in 1980 and was 32 years old on the alleged disability onset date, making her a younger individual under Social Security Regulations at all relevant times. (Tr. 26.)  She had at least a high school education.  *Id*.  Ms. Maldonado had not worked since May 2013, the alleged onset date.  (Tr. 18.)

B.    **Medical evidence**[1]

1.    **Mental Health Treatment History**

On November 22, 2016, Ms. Maldonado established care with primary care provider Shawna Koprucki, M.D. at St. Elizabeth Health Center, reporting concerns that included mood swings, depression, and thoughts of self-harm, with a recent slight self-inflicted injury to her right wrist.  (Tr. 331-332.)  On examination, she was oriented to person, place, and time, but exhibited a depressed mood with delayed speech, slowed motor activity, and impaired cognition and memory.  (Tr. 333.)  She was diagnosed with a severe episode of major depressive disorder, without psychotic features.  (*Id.*)  She was started on Prozac and referred to counseling.  (*Id.*)

On January 6, 2017, Ms. Maldonado presented to Turning Point Counseling Services ("Turning Point") to establish care, reporting she had been referred by her counselor at New Day Counseling to address mood disorder symptoms.  (Tr. 367.)  On intake, she reported to therapist Lynne Beck that she was isolating, felt empty inside, and had no interest in doing things outside of doing things with her family.  (Tr. 374.)  She also reported anxiety around a lot of people, and a history of panic attacks and abuse.  (*Id.*)  Ms. Maldonado reported coping by staying busy helping family members, cooking, and cleaning, in addition to blocking emotions and keeping things to herself.  (*Id.*)  Ms. Beck indicated that Ms. Maldonado's anxiety and depressive symptoms might be decreased with medication management and counseling.  (Tr. 375.)

On January 30, 2017, Ms. Maldonado initiated medication management treatment with Prasad Guttikonda, M.D. at Turning Point.  She reported to Dr. Guttikonda that she "never felt

---

[1]  Because Ms. Maldonado's substantive arguments focus on her mental health impairments and treatment, the evidence summarized herein focuses on those impairments.  It is noted that neither party included a "Facts" section in their brief, as required by the Initial Order in this case.  (ECF Doc. 5 p. 2.)  It is further noted that Ms. Maldonado, proceeding *pro se*, did not identify specific record evidence in support of her arguments, although she did allude to hearing testimony and a letter provided by her Clinical Nurse Specialist.  All evidence that was referenced with enough specificity for identification is addressed herein.

good in the recent past," and was experiencing depression, mood swings, and seeing things.  Dr. Guttikonda noted that she was "extremely vague as to the visual hallucinations."  (Tr. 377-378.) Dr. Guttikonda diagnosed Ms. Maldonado with major depressive disorder and borderline personality disorder.  (Tr. 386.)

Ms. Maldonado returned to Turning Point for medication management a month later, on February 23, 2017.  (Tr. 381.)  There, she reported to Nurse Practitioner Melinda Smith, DPN, ACNS-BC, APRN, that she did not believe the medications were working because she was still having difficulty sleeping and felt irritable, depressed and anxious.  (*Id.*)  On examination, Nurse Practitioner Smith noted that Ms. Maldonado was alert, logical, and cooperative, with calm demeanor, clear speech, and fair insight and judgment.  Ms. Maldonado denied psychosis.  (*Id.*) In response to the continued symptoms, Nurse Practitioner Smith increased Ms. Maldonado's dosage of Prozac, and added prescriptions for Trazodone and Abilify.  (Tr. 382.)  Ms. Maldonado was instructed to follow up with medication management in one month.  (*Id.*)

At a primary care visit on that same date, Dr. Koprucki noted that Ms. Maldonado's medications had been adjusted by her psychiatric Nurse Practitioner at Turning Point.  (Tr. 395.) On examination, Ms. Maldonodo was oriented to person, place, and time, but with a blunt affect, delayed speech, slowed motor activity, and impaired cognition and memory, but with no homicidal or suicidal ideation.  (Tr. 397.)  She was instructed to follow up with Turning Point as scheduled.  (Tr. 398.)

On April 18, 2017, Ms. Maldonado attended an Urgent Care visit where she reported dizziness and nausea.  (Tr. 403.)  She reported that she was seeing psychiatry and a counselor and taking Prozac, Trazodone, and Abilify, but reportedly did not take her Abilify that day.  (*Id.*) Given her stable examination findings, and after consultation with her primary care provider, Ms.

Maldonado was discharged. (Tr. 404.) She was advised to speak with her psychiatrist about possibly decreasing her Abilify dose, as this was the last medication changed. (Tr. 405.)

On August 1, 2017, over five months after her last medication management visit in February 2017, Ms. Maldonado attended a nursing visit at Turning Point with Michael Walsh, RN, reporting an increase in hallucinations. (Tr. 391.) Nurse Walsh noted in the records for the visit that Dr. Sullivan had authorized an increase in Ms. Maldonado's Abilify dosage and added Seroquel at bedtime. (*Id*.)

Nearly two months later, on September 28, 2017, Ms. Maldonado attended another nursing visit at Turning Point, where she reported to provider Jennifer Evans that her medication was effective in controlling her symptoms with no side effects or issues. (Tr. 384.)

On October 19, 2017, Ms. Maldonado attended a comprehensive assessment and initial counseling session with Melinda Rulli, MS Ed, LPC, at Liberty PsyCare ("PsyCare"). Ms. Maldonado reported prior care at Turning Point, but with no treatment since August. (Tr. 425.) On examination, her motor activity was within normal limits, and she presented with intact comprehension and fair insight and judgment. She was observed to be guarded, restless, resistant, and negativistic, with a constricted affect and moderate agitation, depression, irritability, anxiousness, resentfulness, and hostility. (Tr. 427.) She reported occasional hallucinations, including shadows and nondescript sounds. (*Id*.) Ms. Rulli noted "no emergency symptoms or circumstances were apparent," and established an objective to determine if there was a need for psychiatric evaluation and schedule if indicated. (Tr. 430.)

On November 13, 2017, Ms. Maldonado was noted as a no-show for a counseling appointment at PsyCare. (Tr. 431.) On November 16, 2017, she attended a primary care visit with Dr. Koprucki, where she reported worsening depression and visual and auditory

hallucinations.  (Tr. 411.)  She reported that she was taking her medications, but changed from Turning Point to PsyCare about a month before and would run out of her medications soon. (*Id.*).  She noted a recent missed appointment, and requested a month's supply of her psychiatric medications until she could reschedule her appointment.  (*Id.*).  On examination, she displayed a blunt affect, delayed speech, slowed and withdrawn, paranoid thought content, and impaired cognition and memory.  (Tr. 413.)  Dr. Koprucki agreed to refill her medications temporarily, noting her persistent symptoms despite high doses of Abilify and Prozac, but indicated "[s]he does need to see psychiatry."  (*Id.*)  Her prescriptions for Prozac, Traxodone, and Abilify were renewed.  (Tr. 414.)

On November 20, 2017, Ms. Maldonado returned to PsyCare for counseling.  (Tr. 432.) She reported a recent episode of severe anxiety when she was unable to contact her mother by phone over the weekend, which led her to travel to New York to check on her mother and ultimately bring her mother back to live with her.  (*Id.*)  She also complained of constant stress relating to symptoms of depression and anxiety, and daily anger and hopelessness relating to past trauma.  (*Id.*)  On examination, Ms. Maldonado was cooperative with appropriate participation, but demonstrated reduced activity, protective guarding, and tearfulness.  (Tr. 432-433.)  Her attention and concentration were within normal limits, as was her speech, but she exhibited a flat affect as well as moderate depression, agitation, irritability, lability, and moderate to severe anxiety.  (Tr. 432.)  She reported visual hallucinations, paranoid thought processes, intrusive thoughts, negative ruminations, excessive worry, and moderately reduced self-esteem.  (*Id.*)  Ms. Rulli rated Ms. Maldonado's level of impairment as no more than moderate in all areas of functioning, except that occupational adjustment was rated as "severely impaired." (Tr. 433.)

6

Ms. Maldonado returned to PsyCare for counseling with Ms. Rulli on December 11, 2017.  (Tr. 436.)  She reported moderate anxiety about needed gallbladder surgery, explaining she had declined to schedule the surgery because of her fear.  (*Id.*)  She also reported guilt regarding her daughter's learning disability and feeling discouraged after seeing a hallucination of a man riding a bike over the weekend.  (*Id.*)  Ms. Rulli's findings on examination were largely the same as the prior session, with the additional note of thoughts regarding guilt.  (Tr. 436-437.)  Ms. Rulli's impairment ratings were modified to reflect a moderate to severe level of impairment in the areas of economic distress and psychiatric symptoms.  (Tr. 437.)

A month later, on January 18, 2018, Ms. Maldonado returned to PsyCare for counseling with Ms. Rulli.  (Tr. 441.)  She complained that she often felt "empty or 'blank' emotionally (derealization)," but described recent successes in managing anxious feelings when transporting her daughter to a therapy session and taking her four-year-old daughter to Chuck E Cheese for her birthday.  (Tr. 442.)  On examination, Ms. Maldonado was adequately groomed and exhibited normal motor activity, adequately articulated speech, and relevant and coherent thought processes.  (*Id.*)  She was tense and guarded with a flat and restricted affect, as well as pressured and monotone speech, but became more open and engaged as the session progressed. (*Id.*)  Her mood was noted to be moderately depressed and anxious, and mildly irritable and angry.  (*Id.*)  Ms. Maldonado reported "some moderate derealization / emotional numbness about once or twice a week while doing chores or conversing with loved ones."  (*Id.*)

Although the record does not contain medication management treatment records from PsyCare, it is noted that Clinical Nurse Specialist Brenda Ritz, MSN, PMHCNS-BC ("CNS Ritz") from PsyCare did provide a medical assessment dated January 25, 2019 in which she indicated that she had been treating Ms. Maldonado for one year as of the date of that

assessment.  (Tr. 486.)  The record therefore suggests that CNS Ritz began treating Ms.

Maldonado for medication management around January of 2018.  It is noted that there are no

medical records in evidence to demonstrate the frequency of those treatment visits or any

objective findings made by CNS Ritz at any such visits.

At her counseling session on February 8, 2018, Ms. Maldonado presented as moderately

depressed and irritable, with Ms. Rulli noting that she began the session as moderately guarded

but became more open and engaged as the session progressed.  (Tr. 445.)  Ms. Maldonado

explained that she had canceled some past sessions due to weather related stress, and also

described anxious/depressive symptoms relating to past trauma.  (*Id.*)  On examination, Ms. Rulli

observed Ms. Maldonado was adequately groomed, with adequately articulated speech,

appropriate and cooperative behavior, relevant and coherent thought processes, and no signs or

symptoms of psychosis.  (*Id.*)  Ms. Maldonado also exhibited a moderately depressed and

anxious mood with mild irritability, monotone speech, tearfulness, guarded behavior, labile

affect consistent with her mood, and restless / tense motor activity with pain behaviors.  (*Id.*)

Maldonado reported no medication side effects.  (*Id.*)  It is again noted that the record suggests

CNS Ritz of PsyCare was treating Ms. Maldonado for medication management at this point, but

there are no specific treatment records from CNS Ritz in evidence.  Ms. Rulli's counseling notes

from that date indicate that Ms. Maldonado's diagnoses were stable or controlled with marked

stressors.  (*Id.*)

Ms. Maldonado returned for counseling on February 22, 2018.  (Tr. 447.)  Ms. Rulli

noted mild progress since intake and status maintained since the prior session.  (*Id.*)  On

examination, Ms. Maldonado was adequately groomed, with adequately articulated speech and

relevant and coherent thoughts, but her mood was noted to be moderately depressed and anxious,

8

as well as mildly irritable and angry.  (*Id.*)  She demonstrated a restricted and labile affect, guarded behavior with poor eye contact, restless and tense motor activity, and paranoid thought content.  (*Id.*)  Ms. Maldonado reported no medication side effects.  (*Id.*)

On March 8, 2018, Ms. Maldonado attended a primary care visit with Dr. Koprucki for general health maintenance.  (Tr. 417.)  While her examination continued to note a blunt affect, slowed motor activity, and impaired cognition and memory, Dr. Koprucki's assessment did not address any mental health diagnoses and there is no reference to continued prescriptions for psychiatric medications.  (Tr. 418.)  This focus on physical conditions continued in subsequent primary care office visits.  (Tr. 421-423.)  This is consistent with CNS Ritz's later statement that she was treating Ms. Maldonado for medication management at this time.  (Tr. 486.)

Ms. Maldonado's next counseling session was on March 15, 2018.  (Tr. 449.)  She again presented as withdrawn and guarded, but became more engaged as the session progressed.  (Tr. 450.)  Ms. Maldonado described remorse regarding raising her voice at her children, and appreciation for her fiancé and his role as the father to her children.  (*Id.*)  It was noted that Ms. Maldonado had made mild progress and status maintained since both intake and the prior session.  (*Id.*)  On examination, Ms. Maldonado was adequately groomed with adequately articulated speech, relevant and coherent thought processes, and no signs/symptoms of psychosis.  (*Id.*)  Her mood was moderately depressed, irritable, and anxious, and she presented with a restricted and labile affect, pressured speech, guarded behavior with poor eye contact and crying, restless and tense motor activity, paranoid thoughts, and negative ideation.  (*Id.*)  Ms. Maldonado's impairments were noted to be controlled with marked stressors, with the degree found to be moderate.  (*Id.*)  Ms. Maldonado reported some sleeplessness with her recent medication change.  (*Id.*)

Ms. Maldonado next returned for counseling on April 5, 2018.  (Tr. 455.)  Ms. Rulli again noted mild progress and status maintained since intake and the prior session.  (Tr. 456.) On examination, Ms. Maldonado was adequately groomed, with adequately articulated speech, cooperative behavior, and relevant and coherent thought processes.  (*Id.*)  She also presented as moderately depressed, irritable, and anxious, with restricted and labile affect, pressured speech, guarded behavior with crying, becoming more engaged as the session progressed, restless and tense motor activity, and complaints of visual and auditory hallucinations ("sees shadows"), as well as paranoid thought processes.  (*Id.*)  She reported no medication side effects.  (*Id.*)

At Ms. Maldonado's next counseling session on April 23, 2018, Ms. Rulli continued to note mild progress since intake and the prior session.  (Tr. 458-459.)  On examination, Ms. Maldonado was adequately groomed, with adequately articulated speech, cooperative and appropriate behavior, normal motor activity, relevant and coherent thought processes, and no signs or symptoms of psychosis.  (Tr. 459.)  She also presented as moderately depressed, mildly irritable, and anxious, with an affect consistent with her mood, and tense motor activity with shifting positions.  *Id*.

Ms. Maldonado next returned to PsyCare for counseling a month later, on May 21, 2018. (Tr. 461.)  She complained of moderate depression and anxiety about feeling "empty inside," and was tearful discussing relations with her daughter.  (Tr. 462.)  She reported a moderately successful outing at the park, noting difficulty being around strangers and becoming irritable when children shout.  *Id*.  Ms. Rulli noted that Ms. Maldonado had by then made moderate progress since intake, and mild progress since the prior session.  (Tr. 461.)  On examination, Ms. Maldonado was adequately groomed, with adequately articulated speech, and cooperative and appropriate behavior.  (*Id.*)  She also presented as moderately depressed and irritable, mildly

anxious and angry, with labile affect, restless and tense motor activity, and paranoia.  (*Id.*)  She reported no medication side effects.  (*Id.*)  Her impairments were noted to be controlled with marked stressors, with the degree found to be moderate.  (Tr. 462.)

At Ms. Maldonado's next counseling session on June 11, 2018, she reported moderate marital dysfunction relating to her and her fiancé's shared depressive symptoms.  (Tr. 464-465.) Ms. Rulli noted mild progress and status maintained since both intake and the prior session.  (Tr. 465.)  On examination, Ms. Maldonado was adequately groomed, with adequately articulated speech, cooperative and appropriate behavior, good eye contact, normal motor activity, relevant and coherent thought processes, and no signs or symptoms of psychosis.  (*Id.*)  Her mood was moderately depressed, and mildly irritable and anxious.  (*Id.*)  She also demonstrated a restricted affect and tense motor activity.  (*Id.*)  Ms. Maldonado again reported no medication side effects, and the degree and status of her diagnoses remained the same.  (Tr. 461-462.)

Ms. Maldonado returned for counseling a month later, on July 12, 2018.  (Tr. 467.)  She complained of moderate depressive symptoms, with stress relating to a visit from her elderly mother, and flashbacks to negative events in her childhood that contributed to her worries and fears about her children.  (Tr. 468.)  Ms. Rulli noted moderate progress since intake and mild progress since the prior session, with the problem noted to be chronic.  (Tr. 467.)  On examination, Ms. Maldonado was adequately groomed, with adequately articulated speech, cooperative and appropriate behavior, good eye contact, and relevant and coherent thought processes.  (*Id.*)  Her mood was moderately depressed and mildly irritable, anxious, and angry. (*Id.*).  She displayed a restricted affect, pressured speech, restless and tense motor activity with shifting of positions, and paranoia.  (*Id.*)  Ms. Maldonado reported no medication side effects, and Ms. Rulli's assessment of the degree and status of her diagnoses remained the same.  (Tr.

467-468.)  Ms. Maldonado was noted to be a no-show to her next counseling session on July 26, 2018.  (Tr. 470.)

Ms. Maldonado did not return to counseling until several months later, on September 20, 2018, when she reported a positive change in circumstances as she adjusted to her mother's absence and her daughters beginning school.  (Tr. 471.)  Despite the gap in treatment, Ms. Rulli continued to note moderate progress since intake and mild progress since the prior session.  (Tr. 472.)  On examination, Ms. Maldonado was adequately groomed and displayed appropriate hygiene, adequately articulated speech, cooperative and appropriate behavior, good eye contact, relevant and coherent thought processes, and no signs or symptoms of psychosis.  (*Id.*)  Her mood was moderately depressed and anxious, and mildly irritable and angry.  (*Id.*)  She presented with a restricted affect, pressured speech, and restless and tense motor activity with shifting of positions.  (*Id*.)  She reported no medication side effects.  (*Id*.)  Her diagnoses continued to be assessed as moderate in degree, and controlled with marked stressors.  (*Id.*)

Ms. Maldonado next attended counseling on October 4, 2018.  (Tr. 474.)  Ms. Rulli continued to note moderate progress since intake and mild progress since the prior session, as well as controlled / stable conditions, but with marked stressors, all moderate in degree.  (Tr. 475.)  On examination, Ms. Maldonado was adequately groomed with adequate hygiene, adequate articulated speech, cooperative and appropriate behavior, and relevant and coherent thought processes.  (*Id*.)  Her mood was moderately depressed and mildly irritable, anxious, and angry.  (*Id*.)  She displayed a restricted affect, pressured speech, restless and tense motor activity, and paranoia.  (*Id*.)  She reported no medication side effects.  (*Id*.)

Ms. Maldonado's next counseling session was a month later, on November 5, 2018.  (Tr. 477.)  Ms. Rulli's assessment of Ms. Maldonado's progress remained the same.  (Tr. 478.)  On

examination, Ms. Maldonado was adequately groomed, with adequately articulated speech, cooperative and appropriate behavior, good eye contact, and relevant and coherent thought processes.  (*Id*.)  Her mood was moderately depressed and irritable, and mildly anxious and angry, with restricted affect, pressured speech, restless motor activity, and paranoia.  (*Id*.)  She reported no medication side effects.  (*Id*.)

The last counseling session in the record was another month later, on December 13, 2018.  (Tr. 480.)  Ms. Maldonado complained of moderate symptoms including irritability, fatigue, and anxiety relating to a recent visit from her mother, with seasonal anxiety regarding her daughter's school progress.  (Tr. 481.)  Ms. Rulli's assessment of Ms. Maldonado's progress and the status of her conditions remained unchanged.  (*Id*.)  On examination, she was adequately groomed, with adequately articulated speech, cooperative and appropriate behavior, good eye contact, and relevant and coherent thought processes.  (*Id*.)  Her mood was moderately depressed, irritable, and angry, with hypomania, labile affect, pressured speech, restless and tense motor activity, and paranoia.  (*Id*.)  She continued to report no medication side effects.  (*Id*.)

## 2.    Opinion evidence

### i.    Consultative examinations

On May 5, 2017, Stephanie Kopey, D.O., performed an internal medicine consultative examination of Ms. Maldonado at the request of the state agency.  (Tr. 350-357.)  On examination, Ms. Maldonado's manual muscle functioning and range of motion was in the normal range.  (Tr. 350-353.)  Her behavior, mood, and affect were appropriate.  (Tr. 356.)  Based on her examination, Dr. Kopey opined that Ms. Maldonado could lift up to 20 pounds at the waist level, and had no limitations in sitting, standing, or walking, but should avoid prologued or repetitive fine motor tasks with the right hand, the use of vibrating tools, and

repetitive gripping. (Tr. 357.) She also noted that Ms. Maldonado reported psychological symptoms and recommended a psychiatric consultative examination. (*Id*.)

On May 24, 2017, psychologist Kenneth Gruenfeld, Psy.D., performed a psychiatric consultative examination of Ms. Maldonado at the request of the state agency. (Tr. 360-365.) Dr. Gruenfeld noted that Ms. Maldonado presented with a brace on her right hand, maintained poor eye contact, and was clearly anxious and shaking during the examination, and that her mood and affect were depressed. (Tr. 361-363.) Nevertheless, she was alert, well groomed, and maintained appropriate hygiene. (Tr. 362.) Her speech was within normal limits and not pressured. (Tr. 363. She answered all questions and remained consistently on topic, elaborated when requested, and did not need questions repeated to her. (*Id*.) She was oriented to person, place, and time, exhibited good concentration, recalled three of three objects after fifteen minutes, and completed serial 7 subtraction down to 2. (*Id*.) Dr. Gruenfeld diagnosed her with Major Depressive Disorder, Recurrent, Moderate. (Tr. 364.) He opined that her problems with focus and motivation would impact her ability to consistently carry out job tasks, cause her to work more slowly than others and struggle with multi-step tasks. (Tr. 364.) He noted that Ms. Maldonado reported problems with interpersonal interaction, and opined "[t]herefore" that she would "likely … be able to perform adequately in a work environment with minimal social requirements." (Tr. 364.) He also noted her reported difficulty with concentration, motivation, and performing tasks due to anxiety symptoms, and opined that "[i]t is likely an increase in stress or pressure would increase all the symptoms." (Tr. 364-365.)

ii.      Opinion of Plaintiff's medical provider

On January 25, 2019, CNS Brenda Ritz, who reported a one-year treating relationship with Ms. Maldonado at PsyCare, completed a Medical Assessment of Ability to do Work-

Related Activities in support of Ms. Maldonado's application for benefits. (Tr. 484-486.) In her Assessment, CNS Ritz opined that Ms. Maldonado could work zero hours in an eight-hour workday and had marked or extreme limitations in nearly all elements of making occupational adjustments, performance adjustments, or personal-social adjustments, with moderate limitations in following work rules, simple job instructions, and maintaining personal appearance. (Tr. 484-485.) She explained that Ms. Maldonado's diagnoses "make[] it difficult to complete even simple tasks," and that Ms. Maldonado "[h]as extreme difficulty in social settings." (Tr. 485.) She noted that Ms. Maldonado's diagnoses included post-traumatic stress disorder ("PTSD"), schizoaffective disorder, and specified trauma- and stressor-related disorder. (Tr. 485.) When asked if her patient is a malingerer, she checked the box "Yes." (Tr. 486.)

iii. State agency reviewers

On May 22, 2017, state agency reviewing physician Leslie Green, MD, reviewed the record and opined that Ms. Maldonado was limited to light exertional work with the following additional limitations to her physical residual functional capacity ("RFC"):

- frequently climb ramps and stairs;

- never climb ladders, ropes, or scaffolds;

- never crawl;

- limited right handling and fingering; and

- avoid concentrated exposure to extreme heat, extreme cold, vibration, fumes, odors, dust, gases, poor ventilation, and hazards such as machinery and heights.

(Tr. 103-105.)

On June 15, 2017, state agency reviewing psychologist Karla Delcour, Ph.D., reviewed the record and opined that Ms. Maldonado had the following mental RFC limitations:

- limited to carrying out simple, repetitive 1 to 2 step instructions in a non-fast-paced work environment without strict production quotas;

- limited to working with coworkers or supervisors on a superficial and occasional basis;

- unable to work with the general public; and

- limited to working in a relatively static work environment, where changes are few, infrequent, and can be explained in advance.

(Tr. 105-107.)

On September 14, 2017, state agency reviewing psychologist Katherine Reid, Psy.D., reviewed the record and concurred with the opinion of Dr. Delcour.  (Tr. 136-138.)

On September 15, 2017, state agency reviewing physician Leigh Thomas, MD, reviewed the record and concurred with the earlier opinion of Dr. Green.  (Tr. 134-136.)

### 3.     Evidence submitted after the ALJ's Decision[2]

After the ALJ's decision was issued, Ms. Maldonado submitted a letter from CNS Ritz, dated May 28, 2019, which stated that CNS Ritz was treating Ms. Maldonado for schizoaffective disorder and other trauma- and stressor-related disorder, with prescribed medications including quetiapine, fluoxetine, Latuda, hydroxyzine pamoate and Wellbutrin SR.  (Tr. 12.)

Ms. Maldonado also submitted additional evidence which included a list of medications prescribed by Turning Point Counseling Services from August 1, 2017 through September 29, 2017, and pharmacy documentation regarding prescriptions from CNS Ritz for Bupropion HCI, Quetiapine Fumarate, Fluoxetine HCL, Hydroxyzine Pamoate, and Latuda.  (Tr. 34-48, 66.)  The new evidence also contained a summary of diagnoses from Church Hill Family Health Center

---

[2] As explained in section VI.F., *infra,* this evidence can only be considered in the context of a presumed request for sentence six remand, as it was not before the ALJ when he issued the determination that is in dispute here.

and pharmacy documentation for prescriptions from Dr. Koprucki for medications to treat

asthma, inflammation, acid reflux, and cholesterol.  (Tr. 49-64.)

On June 5, 2019, the Appeals Council declined to hear Ms. Maldonado's appeal.  (Tr. 1-

3.)  In explaining its decision, the Appeals Council acknowledged receipt of this additional

evidence, and explained, "We find this evidence does not show a reasonable probability that it

would change the outcome of this decision.  We did not exhibit this evidence."  (Tr. 2.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Ms. Maldonado testified in response to questioning from the ALJ at her March 12, 2019

hearing.  (Tr. 71-86.)  With respect to her work history, she testified that she last worked in 2013,

for one month, answering phones, taking orders, and providing client services.  (Tr. 71-72.)

Prior to that, she worked through a temporary staffing agency in factory or cleaning work.  (Tr.

72-73.)  From 2004 to 2007, she performed a variety of jobs including work at a factory on an

assembly line for sink faucets, and as a cashier.  (Tr. 73-75.)

Ms. Maldonado reported living with her boyfriend and daughters, who were nine and five

years old at the time of the hearing.  (Tr. 76.)  She had been dating her boyfriend for over twenty

years, and they had moved from New York to Ohio together.  (Tr. 84.)  She reported that her

oldest daughter was homeschooled through an online school, and that her youngest had not yet

begun kindergarten.  (Tr. 77.)  With respect to her activities of daily living, Ms. Maldonado

reported trying to do household chores during the day, but said she had difficulty completing

tasks.  (Tr. 77.)  She also reported an inability to focus on reading, which frustrated her.  (Tr. 79.)

Although she drove to the hearing, Ms. Maldonado complained that walking from the car to the

hearing office aggravated her asthma, so she had to use her inhaler upon arrival.  (Tr. 76.)  She

also reported that some days her anxiety prevented her from driving.  (Tr. 77.)  She testified that

her mother lived in upstate New York, about two and a half hours away, and that she would drive

to visit her about twice a year.  (Tr. 78.)  The last time she visited was in November 2018.  (*Id*.)

With respect to her medical impairments, Ms. Maldonado testified that her conditions

affected her ability to work because she could not stay focused or be around other people.  (Tr.

79.)  She also reported physical problems, including swelling in her right hand that affected her

ability to pick things up and hold them.  (*Id*.)  She explained that the brace on her right hand had

been given to her by a doctor in 2015, and that she continued to wear it all the time due to

swelling.  (Tr. 80.)  She testified that walking sometimes activated her asthma.  (Tr. 81.)  She

also stated that her mood disorders caused her to lose her temper when she became frustrated.

(*Id*.)  She reported sometimes telling her children and boyfriend to leave her alone because her

mood was "up there," and she might "get nippy."  (Tr. 82.)

She reported having lost jobs in the past because she took too long in the bathroom.  (Tr.

82.)  She explained that she needed the extra time to deal with her anxiety, but did not inform her

employers of that fact.  (*Id*.)  She stated that she could not be around large groups of people

because she felt like they would invade her space and attack her.  (Tr. 83.)  She also reported

hallucinations that were like shadows and could pop in anytime.  (Tr. 84.)

With respect to her medications, she reported using three inhalers for asthma, and taking

depression pills for her mood swings and anxiety.  (Tr. 85-86.)  She also reported taking pills for

cholesterol and muscle spasms.  (Tr. 85.)  The only side effect she reported noticing was that the

Symbicort inhaler made her jittery.  (Tr. 86.)

18

2.      **Vocational Expert's Testimony**

A Vocational Expert ("VE") testified at the hearing, and classified Ms. Maldonado's past work as that of a telecommunicator, assembler, cashier, and cleaner.  (Tr. 86-87.)

For his first hypothetical, the ALJ asked the VE to assume an individual of Ms. Maldonado's age and education and with her past work, with the following functional limitations:

> This individual would be able to work at the light level. The individual could occasionally use right hand controls, could never climb ladders, ropes, or scaffolds. Could frequently climb ramps or stairs. Could frequently handle and finger objects bilaterally. Could occasionally be exposed to extreme cold and extreme heat. Can have occasional exposure to fumes, odors, dust, and gasses in poorly ventilated areas. Can never use moving machinery, be exposed to unprotected heights, or perform any commercial driving. The individual also could -- can perform unskilled, SVP 1 to 2 work, that's free of fast paced production requirements, and involves only routine workplace changes. The individual can have occasional public contact, occasionally do tasks with interaction with co-workers, have occasional contact with supervisors, and contact with others would be superficial, meaning they could do no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, and being responsible for the safety or welfare of others. Would such an individual be able to perform any of the Claimant's past work?

(Tr. 87-88.)

The VE testified that the hypothetical individual would not be able to perform any of Ms. Maldonado's past work.  (Tr. 88.)  However, the VE further testified that the hypothetical individual could perform representative positions in the national economy that the described individual could perform, including marker, router, and collator operator.  (*Id.*)

In his second hypothetical, the ALJ amended the hypothetical to add a limitation of no public contact.  (Tr. 88.)  The VE testified that the hypothetical individual could still perform all three of the jobs he identified.  (*Id.*)

19

For his third hypothetical, the ALJ amended the second hypothetical to add a limitation to sedentary work.  (Tr. 88-89.)  The VE testified that hypothetical individual could still perform a range of sedentary unskilled work, including document preparer and inspector/tester/sorter jobs such as a table worker, and addresser.  (Tr. 89.)

The VE also testified that a worker would need to remain on-task more than 15% of the workday to perform any of the jobs he had identified.  (Tr. 89.)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a

20

severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[3]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his April 5, 2019 decision, the ALJ made the following findings:[4]

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.

2.      The claimant has not engaged in substantial gainful activity since May 23, 2013, the alleged onset date.

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*i.e.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[4] The ALJ's findings are summarized.

3.      The claimant has the following severe impairments: carpal tunnel syndrome, right wrist tenosynovitis, asthma, anxiety disorder, and depression.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except she can occasionally use right hand controls.  She can never climb ladders, ropes, or scaffolds.  She can frequently climb ramps and stairs, but never crawl.  She can frequently handle and finger objects bilaterally.  She can have occasional exposure to extreme heat and cold.  She should avoid the use of moving machinery, commercial driving, and unprotected heights.  She can perform unskilled (SVP 1-2) work.  The work environment must be free of fast-paced production requirements and involve only routine work place changes.  She can have occasional public contact.  She can have occasional interaction with coworkers and supervisors.  She is limited to superficial contact with others, defined as no tasks involving arbitration, negotiation, confrontation, direct the work of others, persuading others, or being responsible for the safety and welfare of others.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born in 1980 and was 32 years old, defined as a younger individual age 18-49, on the alleged disability onset date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability.

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including Marker, Router, and Collator Operator.

(Tr. 18-27.)

Based on the foregoing, the ALJ determined that Ms. Maldonado had not been under a disability, as defined in the Social Security Act, from May 23, 2013, through the date of the decision on April 5, 2019.  (Tr. 27.)

## V. Plaintiff's Arguments

On July 23, 2020, Ms. Maldonado filed a Social Security Complaint, seeking judicial review of the Commissioner's determination.  (ECF Doc. 1.)  She asserted that she was denied by the Appeals Council after giving them letters, lists of medication, and reasons for them to review the case again.  (ECF Doc. 1-1.)  She also noted that she had told the Appeals Council "that the lawyer I had at the time file [sic] to give the Judge all my condition and lots of information that was needed and was not given to the Judge at the time," and noted that she felt she was "misrepresented."  (*Id*.)  She explained she was attaching "updated information concerning my condition today," attaching a new undated letter from her counselor Melinda Rulli, MSEd, LPC, which stated that Ms. Maldonado had attended therapy for her mental health with mild improvement over time, but with many symptoms remaining "chronic and disabling," and with her conditions being severe and negatively affecting her ability to function socially and in the workplace.  (ECF Docs. 1-1, 1-2.)

On May 5, 2021, in lieu of a Brief on the Merits, Ms. Maldonado filed a two-page letter requesting that her case be reviewed "because a lot of information was not used and was not given to the judge at the time of my hearing."  (ECF Doc. 20 p. 1.)  She reported feeling "misrepresented" by her lawyer "who stated I only was dealing with depression."  (*Id*.)  She explained that her lawyer did not attend the hearing, but "sent someone else to stand in for her," and that "the representative who she sent was not prepared and didn't have any of my information on my case and stated that I only had depression and that was not the case and she had no paperwork on me for the judge to see."  (*Id.* p. 2.)  Ms. Maldonado also complained of an alleged statement by the VE at the hearing "that I was able to do some jobs like truck driving," which Ms. Maldonado's medications would reportedly not permit her to do.  (*Id.* p. 1.)  She

further complained that a letter from her nurse practitioner, Brenda Ritz, had been sent "stating my condition and what she was treating me for," but that "the judge stated that he was not going to use it for my case." (*Id.* p. 2.) In addition to raising the stated concerns regarding the ALJ hearing and decision, Ms. Maldonado's May 2021 letter described her current treatment modalities, medications, and medication side effects. (*Id.* pp. 1-2.)

As an initial matter, it is noted that Ms. Maldonado is making this appeal *pro se*, and it is well-settled that "inartfully pleaded allegations in a *pro se* complaint are held to less stringent standards than formal pleadings drafted by lawyers." *Franklin v. Rose*, 765 F.2d 82, 84–85 (6th Cir.1985) (internal quotation marks omitted) (*citing Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). The allegations in *pro se* pleadings are entitled to "liberal construction" which sometimes requires "active interpretation ... to encompass any allegation stating federal relief." *Id*.

Applying the standard in *Franklin v. Rose*, the undersigned construes Ms. Maldonado's Complaint and letter as raising the following assignments of error: (1) her representative did not provide competent representation at her hearing and failed to properly develop the record; (2) the ALJ failed to fully develop the record; (3) the ALJ did not base his decision on the record as a whole; (4) the ALJ erred in considering the opinion of her treating CNS; and (5) a sentence six remand is necessary in light of additional records provided after the ALJ's decision. (ECF Docs. 1-1, 20 pp. 1-2.)

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions unless it determines that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Where, as here, the Appeals Council denies review, the decision of the ALJ becomes the final decision of the Commissioner.  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *citing Osburn v. Apfel,* 182 F.3d 918 (table), 1999 WL 503528, at *4 (6th Cir. 1999).  In these cases, the Sixth Circuit has made clear that "we may only review evidence that was available to the ALJ to determine whether substantial evidence supported her decision."  *Id*.

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  To assess whether substantial evidence supports the ALJ's decision, a court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      First Assignment of Error: Ineffective Representation by Plaintiff's Counsel**

Ms. Maldonado asserts that she was "misrepresented" by her lawyer.  (ECF Doc. 20 p. 1.)
More specifically, she notes that the lawyer who attended the hearing with her was a "stand in"
for the lawyer she had worked with previously, and "was not prepared and did not have any
information on my case and stated that I only had depression and that was not the case."  (*Id*. at
2.)  She also asserts the lawyer who represented her at the hearing failed to bring "paperwork"
pertaining to her claim for the ALJ to consider.  (*Id*.)  The Commissioner responds that Ms.
Maldonado has no constitutional right to counsel at a disability benefit hearing, and that her
assertions are factually inaccurate.  (ECF Doc. 21 p. 4.)

First, a review of the record demonstrates that Ms. Maldonado signed a "Appointment of
Representative" form dated January 24, 2019, in which she specifically designated the lawyer
who represented her at the hearing as one of her two appointed representatives.  (Tr. 227.)  In
addition to this written appointment, the hearing transcript reflects that Ms. Maldonado attended
the hearing with her appointed representative and did not raise any objections at that time
regarding her representation, even as her representative made a formal appearance on the record
and presented argument on her behalf.  (Tr. 69-90.)  Thus, the record reflects that Ms.
Maldonado was represented by properly appointed counsel at the time of her hearing.

Second, as a factual matter, Ms. Maldonado's assertions that her attorney "did not have
any information on my case" and "stated that I only had depression" (ECF Doc. 20 p. 2) are not
consistent with the factual evidence of record.  The hearing transcript reflects that her attorney
argued in opening that she "has been diagnosed with major depressive disorder, generalized
anxiety disorder, schizoaffective disorder," that her "depression affects her ability to maintain
focus and concentration," and that her physical impairments included diagnoses of fibromyalgia

and carpal tunnel syndrome.  (Tr. 71.)  In closing, her attorney asserted that she should be found disabled "due to her combined impairments" in that "her depression and anxiety would prevent her from maintaining appropriate focus and concentration, that she's likely be off task more than 15% of the day."  (Tr. 89-90.)  This evidence is inconsistent with Ms. Maldonado's allegation that her attorney provided inappropriately limited arguments in support of her claim.  It is also noted that the ALJ separately sought testimony about Ms. Maldonado's physical and mental impairments, symptoms, and medication side effects.  (Tr. 79-86.)  Thus, it is clear from the transcript that both the arguments of Ms. Maldonado's representative and the testimony considered by the ALJ related to a range of impairments, not only depression.

With respect to Ms. Maldonado's assertion that her representative failed to bring unspecified "paperwork" regarding her claim for the ALJ to consider (ECF Doc. 20 p. 2), it is noted that the vague nature of this allegation makes it difficult to ascertain exactly what paperwork her representative is alleged to have failed to provide.  Potentially, this may refer to the provider letters and pharmacy documents that Ms. Maldonado submitted to the Appeals Council and this Court, all of which were submitted after the ALJ decision was issued in the case.[5]  However, in applying a "liberal construction" of this *pro se* allegation pursuant to *Franklin v. Rose*, 765 F.2d at 84–85, the undersigned will interpret this allegation to include a broader claim that her representative failed to submit a full and complete medical record in support of her claims, as potentially evidenced by the failure to submit into evidence any treatment records from Ms. Maldonado's PsyCare medication management provider, CNS Ritz.[6]

---

[5] It will be addressed in section VI.F., *infra,* whether the failure to provide these late-submitted records prior to the ALJ decision supports a sentence six remand of the case.

[6] As noted in section II.B.1 *supra,* the PsyCare treatment records submitted in support of Ms. Maldonado's application appear to be limited to her initial intake and counseling treatment records with Licensed Professional Counselor Melinda Rulli.  (Tr. 425-483.)  Although a medical assessment was later submitted from Clinical Nurse

Even construing Ms. Maldonado's allegations broadly as described, it is nevertheless irrelevant for purposes of the present analysis whether the apparent failure to submit CNS Ritz's treatment records rose to the level of inadequate assistance or malpractice.  This is because, as correctly argued by the Commissioner, there is no constitutional right to effective counsel in Social Security disability proceedings.  (ECF Doc. 21 p. 4.)

While "[t]he law entitles a claimant to representation by an attorney or other representative at the administrative hearing and in other proceedings relating to a Social Security disability case," *Smith v. Comm'r of Soc. Sec.*, No. 1:12CV2042, 2013 WL 2551951, at *19 (N.D. Ohio June 7, 2013), *citing* 42 U.S.C. § 406(a)(1), the "Supreme Court has never recognized a constitutional right to counsel at an SSA hearing," *id., citing Brandyburg v. Sullivan*, 959 F.2d 555, 562 (5th Cir.1992); *see also Spencer v. Comm'r of Soc. Sec.,* No. 1:13CV454, 2014 WL 4351418, at *4 (S.D. Ohio Sept. 2, 2014).

Courts have accordingly rejected arguments by social security claimants alleging ineffectiveness or malpractice by their counsel as a basis for the remand of an ALJ decision. *See, e.g., id*. at *19-20 (finding assignment of error regarding attorney's alleged failure to make certain arguments at hearing to be without merit); *Meadows v. Astrue*, No. 1:11-CV-02378, 2012 WL 5205798, at *4-5 (N.D. Ohio Sept. 25, 2012) (finding arguments "that the record was incomplete or that counsel was ineffective" to be unavailing because they are not cognizable in a social security disability appeal), *report and recommendation adopted sub nom. Meadows v. Comm'r of Soc. Sec.*, No. 1:11 CV 2378, 2012 WL 5199627 (N.D. Ohio Oct. 22, 2012); *Slavin v. Commissioner*, 932 F.2d 598, 601 (7th Cir. 1991) (rejecting ineffective assistance of counsel claim because "there is no principle of effective assistance of counsel in civil cases"); *Cornett v.*

---

Specialist Ritz, specifying that she had been treating Ms. Maldonado for a year as of January 2019 (Tr. 484-6), the medication management treatment records from Clinical Nurse Specialist Ritz are not in evidence.

*Astrue,* 261 F. App'x 644, 651 (5th Cir. 2008) (rejecting ineffective assistance of counsel claim and noting that "[t]he Supreme Court has never recognized a constitutional right to counsel in Social Security proceedings").

In this case, the record reflects that Ms. Maldonado chose to appoint counsel to represent her in the initial proceedings.  Even if she had legitimate complaints about the quality of that representation, those complaints would not translate to a cognizable basis for relief before this Court.  Accordingly, Ms. Maldonado's first assignment of error, challenging the effectiveness of her representation at the ALJ hearing, is found to be without merit.

**C.      Second Assignment of Error: Failure of ALJ to Develop the Record**

Ms. Maldonado also claims error because "a lot of information" that she reportedly provided regarding her health impairments "was not used and was not given to the judge at the time of my hearing."  (ECF Doc. 20 p. 1.)  The Commissioner responds that "the ALJ appropriately reviewed the record and reasonably determined that Ms. Maldonado's mental impairments were not disabling."  (ECF Doc. 21 p. 5.)  Liberally construing Ms. Maldonado's arguments, her statements are interpreted to encompass an argument that the ALJ erred because the record was incomplete at the time of the hearing and he failed to further develop the record.

The Sixth Circuit holds ALJs responsible for ensuring that every claimant receives a full and fair hearing, acting "as an examiner charged with developing the facts." *Lashley*, 708 F.2d 1048, 1051 (6th Cir. 1983), *quoting Richardson v. Perales*, 402 U.S. 389, 411, 91 S.Ct. 1420, 1432, 28 L.Ed.2d 842 (1971); *see also* 20 C.F.R. 404.1529(c)(2) (2006) ("We must always attempt to obtain objective medical evidence....").

Nevertheless, it is also well-established that "the claimant bears the ultimate burden of proving disability," *Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008), and thus the responsibility to produce evidence in support of disability.  *See Meadows*, No. 1:11-CV-

02378, 2012 WL 5205798, at *3-4 (finding any deficiency or incompleteness of the record is imputed to the claimant, and accordingly fails support a remand); *see also Struthers v. Comm'r of Soc. Sec.*, 101 F.3d 104 (table), 1999 WL 357818 at *2 (6th Cir. May 26, 1999) (finding ALJ did not err in failing to make further efforts to obtain opinion evidence, since it was the duty of the claimant to develop the record to provide evidence of a mental impairment).

To be sure, there are special circumstances where an ALJ must "exercise a heightened level of care" in developing the record, to the point that he or she must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Lashley*, 708 F.2d at 1051-52.  But those special circumstances arise where a claimant is without representation *and* subject to other limitations such as an inability to present an effective case and lack of familiarity with hearing procedures.  *See Wilson*, 280 F. App'x at 459, *citing Lashley*, 708 F.2d at 1051-1052; *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003) ("Only under special circumstances, i.e., when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures, does an ALJ have a special, heightened duty to develop the record."), *citing Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 856 (6th Cir. 1986) *and Lashley*, 708 F.2d at 1051–52.  Indeed, the Sixth Circuit has held that this heightened level of care did not attach even to an unrepresented claimant where the hearing transcript reflected an adequate presentation to the ALJ and a grasp of the proceedings.  *See Wilson*, 280 F. App'x at 459.

The Sixth Circuit decision in *Wright-Hines v. Commissioner* is instructive here.  597 F.3d 392 (6th Cir. 2010).  In that case, the court held that a plaintiff who was represented at her ALJ hearing but filed her appeal *pro se* could not establish that the ALJ failed in his duty to develop the record based on missing record evidence.  The plaintiff had challenged the ALJ's

30

determination that her prior work as a cashier qualified as past relevant work, arguing that the ALJ had failed to elicit evidence at the hearing regarding the brief duration of that work. *Wright-Hines,* 597 F.3d at 396.  The Sixth Circuit acknowledged that "the ALJ has an inquisitorial duty to seek clarification on material facts, and … would have been well-advised to confirm [plaintiff's] past work as a cashier at the hearing," but found that the record nevertheless contained substantial evidence to support the ALJ's conclusions. *Id.*  The court explained:

> "[W]e cannot excuse [plaintiff's] failure to provide us with the factual record we need to find in her favor. To do so would be to treat [this plaintiff] differently than other Social Security claimants for no other reason than that she proceeded *pro se* in the district court and on appeal. However, the focus of our inquiry is what occurred in the administrative proceedings, when she was represented by counsel. On this record, we cannot say that the ALJ utilized an incorrect legal standard or that substantial evidence did not support the ALJ's conclusions.

> *Id*.

In this case, where Ms. Maldonado was represented by counsel at the hearing, the ALJ did not have a heightened duty of care to develop the record.  The burden instead fell on Ms. Maldonado to produce evidence and develop the record in support of her disability claims. *See* 20 C.F.R. § 404.1512(a).  The record reflects that Ms. Maldonado and her representative submitted many pages of treatment records in support of her claim, and that Ms. Maldonado herself provided supporting testimony at the hearing.  It is additionally noted that the Agency obtained two consultative examinations in the early stages of the application in light of the relatively limited medical records at that time, which were in the record at the time of the hearing and were discussed in detail in the ALJ's decision.  (Tr. 19-26, 350-359, 360-366.)

To the extent that Ms. Maldonado now asserts that the medical records submitted in support of her claim were inadequate or incomplete, she was the one who bore the burden to identify the inadequacy and take measures to address it at the hearing level.  Because she bore the burden to develop the record in support of her claims, the lack of any evidence now argued to

31

be absent from the record cannot support a finding of error on the part of the ALJ.  Accordingly, Ms. Maldonado's second assignment of error is found to be without merit.

**D.      Third Assignment of Error: Failure of ALJ to Consider the Record as a Whole**

Ms. Maldonado's claim that "a lot of information" she provided regarding her health impairments "was not used" (ECF Doc. 20 p. 1), may alternately be construed as an argument that the ALJ failed to consider the record as a whole in making his determination in the case. That argument is addressed below as Ms. Maldonado's third assignment of error.

The ALJ must review all evidence in making his determinations. 20 C.F.R. § 416.927(e)(2).  The Sixth Circuit has made clear that failing to consider the record as a whole undermines the ALJ's decision. *See Hurst v. Sec'y of Health & Human Servs*., 753 F.2d 517, 519 (6th Cir. 1985).  An ALJ cannot simply "pick and choose" evidence in the record, "relying on some and ignoring others, without offering some rationale for his decision."  *Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).  Conversely, an ALJ need not discuss every piece of evidence in the record.  *Thacker v. Comm'r of Soc. Sec.,* 99 F. App'x 661, 665 (6th Cir. 2004).

There are two parts of the record that Ms. Maldonado may be arguing the ALJ failed to consider: the side effects of her medications and a letter from her nurse practitioner.  (ECF Doc. 20 pp. 1-2.)  In particular, she asserts that the VE testified she was able to do "some jobs like truck driving," when her current medications make her unable to drive.  (*Id.* at 1.)  She also asserts that she learned the ALJ "was not going to use" a letter from her nurse practitioner, Brenda Ritz, and wondered "why it was not used when she is the one who knows what I am dealing with everyday with my mental health."  (*Id.* at 2.)  As a preliminary matter, it is noted that there are two documents from CNS Ritz in the record, an assessment submitted prior to the

32

hearing (Tr. 484-6) and a letter submitted after the ALJ decision (Tr. 12).  For the reasons discussed in section VI.F. *infra*, the letter submitted after the ALJ decision cannot be considered in this assignment of error, as it was not before the ALJ when he issued his decision.  This discussion will accordingly focus on the assessment that was in evidence at the hearing.

With respect to the evidence of record relating to medications and medication side effects, Ms. Maldonado's representative filed a list of medications on June 5, 2019.  (Tr. 323.) Her medical records also identify prescribed psychiatric medications and an urgent care visit for dizziness and nausea that may have been associated with a medication change.  (*See, e.g.,* Tr. 333, 381-2, 384, 391, 403-5, 413-4.)  Although the record does not contain medication management treatment notes from CNS Ritz, Ms. Maldonado's counseling records from PsyCare during that time routinely noted that she did not complain of side effects from her medications, except for sleepiness reported on one visit due to a medication change.  (*Compare* Tr. 445, 447, 456, 461-2, 467-8, 472, 475, 478, 481 *with* Tr. 449.)

At the hearing, the ALJ asked Ms. Maldonado whether she suffered side effects from her medications, and she testified "not that I've noticed."  (Tr. 86.)  She later clarified that one of her asthma pumps, Symbicort, "makes [her] jittery."  (*Id.*)  Her hearing testimony also addressed her ability to drive.  She testified that she had driven herself to the hearing, and also drove two hours to visit her mother in upstate New York a couple of times per year, but was unable to drive in snowstorms due to anxiety.  (Tr. 76, 78-79.)

The ALJ's decision contains substantial discussion of the claimant's medications, noting that Maldonado reported use of an albuterol inhaler in October 2016, that her "medications included Prozac 40 mg, Trazodone 100 mg, and Abilify 5 mg" in February 2017, that her "dosages of Abilify was increased and Seroquel 100 mg was added at bedtime" in August 2017,

and that she "was started on Flexeril and Celebrex" in March 2018.  (Tr. 21-4.)  During the remainder of 2018, the ALJ noted that the record did not reflect any changes in medications.  (Tr. 24.)  The ALJ's observations are consistent with what the records in evidence show, and do not suggest that the ALJ was "picking and choosing" the evidence he relied upon.

To the extent that the ALJ failed to discuss medication side effects in his decision, it is again noted that there is no requirement that he discuss every piece of evidence in the record. Indeed, the lack of discussion on this point is consistent with the medical records and testimony discussed above, which generally reflected limited complaints relating to medication side effects. It is also noted that Ms. Maldonado's argument that the VE improperly found her capable of working as a truck driver is factually unsupported, as the ALJ's RFCs expressly stated that Ms. Maldonado must "avoid commercial driving" (Tr. 20), and the VE did not identify truck driving as a representative job at the hearing (Tr. 87-89).

With respect to the separate argument that the ALJ did not "use" an unspecified letter from CNS Ritz, the evidence reflects that the only document from that provider in evidence before the ALJ was a medical assessment dated January 29, 2019.  (Tr. 484-486.)  The record also demonstrates that the ALJ specifically addressed that assessment in his decision, describing its contents and affording the opinion "little weight" because it was inconsistent with findings during treatment and not consistent with the record as a whole.  (Tr. 25.)  Because the record reflects that the ALJ did specifically discuss the opinion in his determination, there is no support for a finding that the ALJ did not consider the whole record.

The record thus does not support a finding that the ALJ failed to consider the entire record in making his findings.  Accordingly, Ms. Maldonado's third assignment of error is found to be without merit.

34

**E.**     **Fourth Assignment of Error: Opinion of Clinical Nurse Specialist Ritz**

Ms. Maldonado asserted in her request for review: "I found out a letter was sent from my Nurse practitioner (Brenda Ritz) stating my condition and what she was treating me for and the judge stated he was not going to use it in this case."  (ECF Doc. 20 p. 2.)  As discussed above, the record does not support a finding that the ALJ failed to consider CNS Ritz's opinion in his decision.  Nevertheless, construing Ms. Maldonado's arguments liberally, it must also be considered whether the ALJ erred in assigning "little weight" to the opinion of CNS Ritz.  As with the prior assignment of error, this discussion must necessarily be limited to the assessment in evidence before the ALJ, and not any evidence submitted after the ALJ decision was issued.[7]

Even where an ALJ's decision was supported by substantial evidence, that decision will not be upheld when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *See Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) ("Even if supported by substantial evidence, … a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, … we review decisions of administrative agencies for harmless error.").

In assessing whether the ALJ erred in assigning little weight to this opinion, the appropriate regulations must be considered.  Here, because Ms. Maldonado filed her disability claim on February 10, 2017, all opinion evidence must be evaluated under the regulations for claims filed prior to March 27, 2017.  Under those regulations, only "acceptable medical

---

[7] To the extent that Ms. Maldonado is challenging the Appeals Council's determination that the evidence submitted after the ALJ's decision "does not show a reasonable probability that it would change the outcome of the decision" and would not be exhibited (Tr. 2), her possible request for a sentence six remand based on new evidence will be addressed in section VI.F. *infra*.

sources" as defined under 20 C.F.R. § 404.1513(a) can provide evidence to establish the existence of a medically determinable impairment, give medical opinions, or be considered treating sources whose medical opinions may be entitled to controlling weight. SSR 06-03p, 2006 WL 2329939, at *2.  Once the provider meets the threshold to be considered an acceptable medical source, a treating source opinion is afforded more weight than a source who has simply examined the claimant, and an examining source is given more weight than a source who has not performed an examination.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013), *citing* 20 C.F.R. § 404.1502, 404.1527.  Opinions from nontreating and nonexamining sources are weighed based on examining relationship, specialization, consistency, and supportability.  *Id.* at 376, *citing* § 404.1527(c).

In this case, the ALJ assigned "little weight" to the January 2019 medical assessment by CNS Ritz, explaining:

> although she is an acceptable medical source and a treating source, her opinion is not consistent with her own findings during treatment.  Indeed, while the claimant's findings regarding paranoia and some hallucinations are significant, the treatment record as a whole does not support the many marked and extreme limitations opined.  As such, her opinion is not consistent with the record as a whole and is given little weight.

(Tr. 25.)

As a preliminary matter, it is noted that the treating source framework is not the correct framework for weighing this opinion.  A treating source must be an "acceptable medical source," and the former § 404.1513 established that a nurse practitioner like CNS Ritz is not an "acceptable medical source."  Instead, such providers fall into the category of "other source." 20 C.F.R. § 404.1513(d)(1); *see also* SSR 06-03p, 2006 WL 2329939, at *2 (nurse practitioners are medical sources who are not acceptable medical sources).  An opinion from such a provider "cannot establish the existence of a medically determinable impairment," but "may provide

36

insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 541 (6th Cir. 2007), *quoting* SSR 06-03P, 2006 WL 2329939, at *2 (internal quotation marks omitted).  The ALJ has discretion to determine the proper weight assigned to such sources based on the evidence of record.  *Id.*

In this case, the ALJ gave little weight to CNS Ritz's opinion – that the claimant could work zero hours in an eight-hour day and had marked or extreme limitations in nearly all functional areas classified – explaining that the opinion "it is not consistent with her own findings during treatment" and that "the treatment record as a whole does not support the many marked and extreme limitations opined."  (Tr. 25.)

As a general matter, the ALJ's discussion of the evidentiary record and other opinion evidence does flesh out these findings.  He described Ms. Maldonado's symptomatic complaints at her treatment visits, but also noted her report to her provider that she lived with her fiancé and two daughters and "stayed busy by helping family members, cooking and cleaning."  (Tr. 22.) He noted her depressed and anxious mood and affect, but otherwise normal mental status examination findings at the consultative examination.  (Tr. 23.)  He described mental status examinations noting hallucinations and paranoia, but with other normal findings.  (*Id.*)  He noted that Ms. Maldonado became more engaged during treatment, was relevant and coherent, and demonstrated waxing and waning of symptoms.  (Tr. 23-24.)  He also assigned great weight to the opinions of the psychological consultative examiner and the state agency reviewing psychiatrists, all of whom were acceptable medical sources whose opinions were noted to be consistent with consultative examination findings and treatment notes.  (Tr. 24-25.)

At first blush, therefore, the ALJ's reasoning is clear and consistent with the regulatory requirement that he "generally ... explain the weight given to opinions from" other sources.  SSR

06-03P, 2006 WL 2329939, at \*6; 20 C.F.R. §§ 404.1527(f)(2) & 416.927(f)(2) (stating "[t]he adjudicator generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case").

However, a closer review reveals a notable inaccuracy in the language used by the ALJ to address the consistency between the opinion and the PsyCare treatment records.  He stated that the marked and extreme findings in CNS Ritz's opinion were "not consistent with *her own findings* during treatment."  (Tr. 25 (emphasis added).)  As discussed previously, a review of the record reveals that there were no treatment records from CNS Ritz in evidence.  Instead, the ALJ appears to be referring to findings that were made by Ms. Rulli at various counseling visits. While the record suggests that CNS Ritz and Ms. Rulli were colleagues, both providing mental health treatment to Ms. Maldonado at PsyCare, the ALJ's description of the counseling records as reflective of CNS Ritz's "own findings" is simply not accurate, and thus raises questions regarding the ALJ's reasoning in giving little weight to the opinion.

It is well-established that a decision will not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011), *quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

Where an ALJ's stated reasons for making a specific determination are inaccurate, it has repeatedly been held that the ALJ failed to build an accurate and logical bridge between the evidence and the result. *See, e.g., Stemple v. Kijakazi*, No. 1:20-CV-485, 2021 WL 4060411, at *8 (N.D. Ohio Sept. 7, 2021) (inaccurate description of opinion's findings); *Morandy v. Comm'r of Soc. Sec.*, No. 2:19-CV-13464, 2021 WL 925227, at *5 (E.D. Mich. Feb. 22, 2021) (inaccurate description of opinion), *report and recommendation adopted*, No. 2:19-CV-13464, 2021 WL 915540 (E.D. Mich. Mar. 10, 2021); *Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, No. 1:16-CV-2569, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017); *Moxley v. Comm'r of Soc. Sec.*, No. 1:15CV1533, 2016 WL 2338205, at *14 (N.D. Ohio Apr. 15, 2016) (inaccurate explanation for finding lack of credibility), *report and recommendation adopted*, No. 1:15CV1533, 2016 WL 1733458 (N.D. Ohio Apr. 29, 2016).

Here, the inaccuracy of the ALJ's statement is of particular concern. The language used by the ALJ suggests that the decision to give "little weight" to CNS Ritz's opinion was based in part on a perception that the clinical findings in evidence were made by CNS Ritz herself, when they were in fact made by Ms. Rulli. In truth, there is no way to know from the present record whether the treatment records of CNS Ritz would be consistent or inconsistent with the findings in her January 2019 opinion. What is clear is that the ALJ's reasoning in giving little weight to CNS Ritz's opinion failed to build an accurate and logical bridge between the evidence and the result. Either he misunderstood the source of the clinical findings he relied upon, or he based his findings on evidence that does not exist in the record. Either way, the undersigned recommends that the case be remanded for a full and accurate explanation of the weight assigned to the January 2019 opinion of CNS Ritz, based exclusively on the evidence in the record.

F.      **Fifth Assignment of Error: Sentence Six Remand**

Because Ms. Maldonado submitted evidence subsequent to the ALJ decision, and has raised *pro se* arguments on appeal that may be inferred to argue error based on the failure to consider that evidence, her assignments of error are broadly construed to include a request to remand the case for consideration of the late-submitted evidence.

The Sixth Circuit explains that "where the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision," and can only consider it as the basis for a sentence six remand. *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  There are two kinds of remand under Section 405(g): a "sentence four remand" made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a "sentence six remand" where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See Melkonyan v. Sullivan,* 501 U.S. 89, 97–101, 111 S.Ct. 2157, 2163–64, 115 L.Ed.2d 78 (1991); *see also Hollon v. Commissioner*, 447 F.3d 477, 486 (6th Cir. 2006).  This Court is not permitted to consider evidence that was not submitted to the ALJ in the sentence four context, but can consider such evidence to determine whether a sentence six remand is appropriate.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007); *Foster*, 279 F.3d at 357.

To justify remand under sentence six, Ms. Maldonado must demonstrate that the evidence she now presents in support of a remand is "new" and "material," and that there was "good cause" for her failure to present this evidence in the prior proceedings.  *See Hollon*, 447 F.3d at 483; *see also Ferguson v. Commissioner*, 628 F.3d 269, 276-278 (6th Cir. 2010) (although the evidence that the claimant sought to introduce was "new," the claimant failed to meet her burden

40

of showing "good cause" for failure to submit the evidence and that the evidence was "material").  Evidence is new "only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted).  Evidence is material "only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence."  *Id.*  (internal quotations and citations omitted).  "A claimant shows good cause by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Id.*  (internal quotations and citations omitted).

Here, a review of the additional records submitted by Ms. Maldonado after the ALJ decision demonstrates that the above standard has not been met.  First, the record does not support a finding that this is evidence is new and material.  For example, most of the diagnoses listed in the May 8, 2019 Ritz letter (Tr. 12) are already in evidence (Tr. 485), and CNS Ritz is also not an "acceptable medical source" for purposes of establishing medically determinable impairments.  Similarly, the lists of prescription medications (ECF Doc. 1-6; Tr. 35-61, 66) are largely consistent with information already in the record (Tr. 283, 291, 305, 323, 411-412, 416-417, 421-422).  The documents relating to time periods before the ALJ decision was issued (Tr. 63-64, 66) do not meet standards to be deemed "new" because there is no information suggesting they were not available to Ms. Maldonado at the time of her hearing.  *See Ferguson*, 628 F.3d at 276.  Conversely, the documents that are undated or explicitly pertain to time periods after the decision was issued (Tr. 12, 35-61; ECF Doc. 1-2) are not "material" because they do not relate to the relevant time period.  *See Ferguson*, 628 F.3d at 277–278, *citing Jones*, 336 F.3d at 478 (finding evidence regarding claimant's condition after the relevant time is immaterial); *see also Wyatt v. Sec. of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992).

41

Even if the late-submitted evidence could be found new and material, Ms. Maldonado has offered no rationale to support a finding that she had "good cause" for failing to present the materials to the ALJ in a timely manner.  In *Bass v. McMahon*, the Sixth Circuit rejected a claim that evidence qualified as "new" in the context of a request for a sentence six remand when "plaintiff's counsel did not seek to have the record remain open to submit the evidence here provided, which in and of itself shows a lack of good cause."  *Bass,* 499 F.3d at 513; s*ee also Martin v. Comm'r of Soc. Sec.*, No. 1:14-CV-01396, 2015 WL 4644615, at *16 (N.D. Ohio Aug. 4, 2015) (finding "good cause" does not exist where claimant's counsel mentioned a new diagnosis at the hearing, but failed to provide records relating to that impairment, and stated at the hearing that the record was complete).  Here, the ALJ asked Ms. Maldonado's counsel "Are you aware of any additional evidence that relates to disability?" and counsel responded, "No." (Tr. 70.)  The evidence thus does not support a finding of good cause for a sentence six remand.

It is noted that the sentence six remand discussion does not address a possible remand for submission of the absent treating notes from CNS Ritz.  That is because those records were never presented by Ms. Maldonado, at any level of review.  The Court therefore has no basis to assess whether the records are "new" or "material," and cannot assess whether "good cause" exists for the delay.  Nevertheless, because remand is recommended in section IV.E., *supra*, for further explanation of the weight given to the January 2019 opinion of CNS Ritz, Ms. Maldonado would have an opportunity on remand to obtain and submit these absent treatment records.

Because the evidence does not support a finding that any of Ms. Maldonado's late-submitted evidence is new and material, or that the failure to timely submit that evidence was

42

supported by good cause, the undersigned finds this assignment of error is without merit.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **VACATED** and that the case be **REMANDED**, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation. On remand, the ALJ should provide a full and accurate explanation of the weight assigned to the January 2019 opinion of CNS Ritz, and ensure that any evidence cited to or relied upon in making that finding is included in the evidentiary record.

November 1, 2021

/s/Amanda M. Knapp

AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).